# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF NEW HAMPSHIRE

In re:

David R. Blais,

                    Debtor

Chapter 7
Case No. 17-11627-BAH

---

M&M Electrical Supply Company, Inc.
& Consolidated Electrical Distributors, Inc.,

                    Plaintiffs

    v.

David R. Blais,

                    Defendant

Adv. Proc. No. 18-1034-MAF

## <u>MEMORANDUM OF DECISION</u>

When a business fails, creditors are often left without payment of their claims.  This is rarely, if ever, a welcome result and creditors frequently question some of the decisions that may have contributed to the business failure.  The evidence presented at trial in this proceeding casts doubt on some of the defendant's decisions.  But that evidence falls short of establishing that he obtained money, property, or services through actual fraud.  The evidence also does not establish that the defendant owes a debt arising out of defalcation in a fiduciary capacity.  As a result, judgment will enter in favor of the defendant.

## THE FACTS

The following are the Court's findings of fact.  These findings are based on (i) the allegations in the plaintiffs' second amended complaint that were admitted by the defendant; (ii) the parties' stipulation of facts; and (iii) the evidence admitted at trial, consisting of 89 exhibits

and the testimony of six witnesses.  Certain disputed facts are not material to the outcome in this proceeding and, because they are not material, the Court has not made findings with respect to those facts.  Some of the undisputed facts are not material to the outcome either, but the findings include some of those facts either for context or, more simply, because the parties asked the Court to find them.

## I. DRB Electric, Inc.

DRB Electric, Inc. ("DRB") is a corporation formed under the laws of the State of New Hampshire in 1996.  The defendant in this adversary proceeding, David Blais, is the former president and secretary of DRB.  His spouse, Therese Blais, is DRB's former vice president and treasurer.  Mr. and Mrs. Blais were also the sole directors and equal shareholders of DRB.

## II. M&M Electrical Supply Company, Inc.

M&M Electrical Supply Company, Inc. ("M&M") is one of the two plaintiffs here. M&M is a supplier of electrical parts based in Nashua, New Hampshire.  Mr. Blais has known Gerald Miele, one of the two principals of M&M, for many years.  They grew up in adjacent neighborhoods, and the two played in the same baseball league as children.  Mr. Blais and Mr. Miele had a close relationship and talked frequently.  At one point, Mr. Blais told a third party that he "basically had [Mr. Miele] wrapped around his finger."

In 1996, M&M agreed to sell supplies to DRB on credit and Mr. Blais guaranteed DRB's obligations to pay for those supplies.  M&M never requested a written financial statement from DRB.  DRB purchased supplies from M&M consistently and DRB generally paid the amounts owed to M&M.  In the five years leading up to DRB's bankruptcy filing, DRB paid M&M more than $500,000 for goods purchased on credit.

In 2015 and 2016, DRB increased its purchases from M&M, and its debt to M&M increased and became past due.  Mr. Miele told Mr. Blais that he was uncomfortable with DRB's balance, and Mr. Blais assured Mr. Miele he would get the balance paid.  M&M did not stop extending credit to DRB but encouraged Mr. Blais to look for another supplier.  Mr. Blais told Mr. Miele: "I consider you guys my friends.  I would never burn you guys."  He said that if he was going to "burn anybody," he would "burn the big guys."  Based on that representation and Mr. Miele's relationship with Mr. Blais, M&M refrained from initiating collection activities against DRB.

Toward the end of 2016, DRB's balance with M&M was greater than ever before, and M&M was loath to extend additional credit.  At that point, Mr. Blais told Mr. Miele that he had landed a job with Parallel Wireless – a big job that would get the balance to M&M paid off.  Mr. Miele relied on that representation and M&M extended additional credit to DRB despite its reservations.  Mr. Miele later came to believe that Mr. Blais had exaggerated the profitability of the Parallel Wireless job.

In 2017, DRB made payments to M&M totaling nearly $70,000, all of which was applied to invoices from 2016.  M&M received its last payment from DRB in May 2017 and shut down DRB's account three months later.  When DRB filed for bankruptcy in October 2017, the debt owed to M&M—approximately $72,000—related solely to invoices issued in 2017.

### III.  Consolidated Electrical Distributors, Inc.

Consolidated Electrical Distributors, Inc. ("CED"), the other plaintiff in this proceeding, is a national distributor of electrical supplies.  In 2012, CED and DRB entered into a credit agreement, and Mr. Blais personally guaranteed DRB's obligations to CED.  In the five years leading up to DRB's bankruptcy filing, DRB paid CED more than $200,000 for goods purchased

on credit.  During that time, CED placed DRB's account on credit hold or otherwise restricted DRB's account on several occasions.

In 2017, DRB purchased more than $155,000 worth of supplies on credit from CED and made payments to CED totaling $73,691.  In March 2017, CED placed DRB's account on hold as a result of a delinquency of $68,236.  DRB later paid off the past-due amount and CED extended additional credit.  As of May 2017, DRB's account with CED was current.  CED last sold DRB goods on credit in early July of 2017.  CED requested a written financial statement from DRB only once, in September 2017.  When DRB filed for bankruptcy in October 2017, the debt owed to CED—approximately $143,000—related solely to invoices issued in 2017.

## IV.    LDJ Bookkeeping.

David and Linda Jennings operate LDJ Bookkeeping.  LDJ began working with Mr. Blais and DRB in 2005 and performed a wide range of services for them, including invoicing customers, managing payroll, entering bills and writing checks to pay bills, making payroll tax payments, performing workers' compensation audits, preparing profit and loss statements, balance sheets, and accounts receivable and payable reports, and preparing and filing income tax returns.  Mr. Jennings performed general bookkeeping services for DRB and maintained records for the company in QuickBooks.

Mr. Blais did not personally input any information into DRB's QuickBooks records or generate reports from QuickBooks.  Instead, he relied on Mr. Jennings "for everything."  Mr. Jennings issued payroll checks and issued corporate reimbursements to Mr. and Mrs. Blais for corporate expenses that they paid personally.  As instructed by Mr. Blais, Mr. Jennings caused DRB to reimburse some personal expenses incurred by Mrs. Blais and to treat those payments as payments on shareholder loans or, alternatively, as additional compensation to Mr. Blais.  Mr.

4

Jennings also attempted to account for Mr. Blais' use of corporate funds for personal expenses.

Mr. Jennings reviewed DRB's credit card and bank statements and regularly met with Mr. Blais

to ask him to identify each check, charge, and withdrawal to determine whether it was a business

expense or a personal expense.  If Mr. Blais had a receipt to show that funds had been used for a

business purpose, Mr. Jennings would record the expense as a business expense.  If not, and if

DRB's records showed a loan payable to Mr. or Mrs. Blais, Mr. Jennings treated the personal

expenses paid with corporate funds as loan repayments to the extent of the amount then due.  If

the records showed no outstanding loan, Mr. Jennings treated the personal expenses paid with

DRB's funds as additional compensation to Mr. Blais and included them on the Form W-2 that

DRB issued to Mr. Blais annually.

Mr. Blais and Mr. Jennings met regularly to review DRB's payables.  During these

meetings, Mr. Blais instructed Mr. Jennings which invoices should be paid and in what amount.

Mr. Jennings also assisted with the creation of invoices issued to DRB's customers.  Mr. Blais

filled in invoice templates and then gave them to Mr. Jennings, who entered the information into

QuickBooks.  DRB's accounts receivable reports were not always accurate reflections of the

amounts owed to the company.  The reports sometimes included invoices that were later voided

or reduced—either because the work was never performed or because the customer refused to

pay the full amount of the invoice.  Certain invoices issued in late 2016 and 2017 were not

legitimate.[1]

---

[1] This finding is based, in part, on Mr. Blais' inability to provide a reasonable explanation for several large invoices that were voided.  The Court credits the notion, offered by Mr. Blais, that customers sometimes do not pay invoices in full.  There are countless reasons why this happens, and discounts frequently grease the skids for payment that might not otherwise be forthcoming.  But some of the invoices in question were created and later voided, in full, with no apparent explanation.

Over the years, Mr. Jennings and Mr. Blais had a good business relationship.  When DRB ceased operating and sought bankruptcy relief, that relationship was stressed.  DRB's chapter 7 trustee demanded a payment of nearly $10,000 from LDJ for fees that DRB paid to LDJ during the 90 days prior to the filing of DRB's petition.  LDJ paid half of that amount to the trustee.

## V.      DRB's Financial Condition.

DRB incurred operating losses in every year from 2011 to 2017:

| Year | Income | Expenses | Profit/Loss |
|------|--------|----------|-------------|
| 2011 | $846,264.49 | $908,740.29 | ($62,475.80) |
| 2012 | $682,521.65 | $749,017.23 | ($66,495.58) |
| 2013 | $1,062,742.77 | $1,164,660.14 | ($101,917.37) |
| 2014 | $949,717.08 | $953,726.93 | ($4,009.85) |
| 2015 | $838,232.57 | $840,267.53 | ($2,034.96) |
| 2016 | $1,078,148.54 | $1,083,920.14 | ($5,771.60) |
| 2017 | $555,495.00 | $1,038,897.00 | ($483,402.00) |

In the years leading up to DRB's bankruptcy filing, its retained earnings trended increasingly negative:

| Year | Retained Earnings |
|------|-------------------|
| 2011 | ($123,287.70) |
| 2012 | ($185,763.37) |
| 2013 | ($193,832.00) |
| 2014 | ($295,274.47) |
| 2015 | ($299,284.32) |
| 2016 | ($296,855.28) |
| 2017 | ($780,257.28) |

In 2014, Mr. Blais sought the advice of bankruptcy counsel for DRB because he was concerned about the company's finances.  At the time, he was not advised to initiate a corporate filing.

Shortly after that consultation, DRB received an infusion of $85,000 from Mr. Raymond, a friend of Mr. Blais with whom DRB had conducted business.[2]

According to its financial statements, DRB's liabilities exceeded its assets on December 31 of each year from 2011 to 2017:

| Year | Assets | Liabilities | Difference |
|------|--------|-------------|------------|
| 2011 | $138,779.65 | $323,543.02 | ($184,763.37) |
| 2012 | $68,239.53 | $234,356.29 | ($166,116.76) |
| 2013 | $132,376.15 | $425,765.52 | ($293,389.37) |
| 2014 | $228,343.79 | $526,628.11 | ($298,284.32) |
| 2015 | $244,162.13 | $543,376.41 | ($299,214.28) |
| 2016 | $539,835.93 | $836,300.89 | ($296,464.96) |
| 2017 | $199,857.02 | $1,064,811.81 | ($864,954.79) |

The increase in liabilities over this period was largely due to increased borrowing from lenders and extension of credit from suppliers.

From time to time, DRB's shareholders loaned money to the company in various forms. Mrs. Blais sometimes used her credit card to pay DRB's bills. Over the years, Mr. and Mrs. Blais also borrowed hundreds of thousands of dollars from their retirement accounts and their home equity line of credit and loaned the funds to DRB. They made these loans to smooth out DRB's cash flow and enable it to pay creditors. All such fund transfers were characterized as shareholder loans to the company, not as contributions of equity capital.

---

[2] Mr. Jennings testified that the loan from Mr. Raymond enabled Mr. Blais to disregard counsel's advice. The plaintiffs urge the Court to draw the "obvious conclusion" that Mr. Blais was told how DRB could avoid bankruptcy and "recklessly rejected that advice because he was able to borrow additional funds." This inference is not as obvious as the plaintiffs believe. The record does not reveal exactly what Mr. Blais was advised to do in 2014. There is also tension between the account of Mr. Jennings (who testified that the cash from Mr. Raymond was a loan and was treated as such until Mr. Raymond died) and the account of Mr. Blais (who testified that the cash from Mr. Raymond was a gift from a friend). The Court does not credit Mr. Blais' testimony on this score. It seems far more likely that the transaction was a loan—perhaps on favorable terms—but a loan, nonetheless. DRB made some payments to Mr. Raymond and listed him as a creditor on its bankruptcy schedules. While neither is determinative, both facts are suggestive of a lending relationship, not a charitable one. That said, the conflicting testimony on this point is not material.

In some years, DRB owed shareholder payables to Mr. or Mrs. Blais at year-end:

| Year | Amount Outstanding |
|------|--------------------:|
| 2010 | $20,660.00 |
| 2011 | $0.00 |
| 2012 | $7,246.00 |
| 2013 | $0.00 |
| 2014 | $32,119.00 |
| 2015 | $28,880.99 |
| 2016 | $0.00 |

In general, however, DRB's shareholder loans were repaid quickly. Mr. Blais felt that it was imperative to repay Mrs. Blais' loans ahead of DRB's other obligations given their relationship and the fact that some of the money loaned came from their retirement funds. When DRB filed for bankruptcy, all shareholder loans had been repaid.

Over the years, DRB also borrowed money from Mr. Jennings, Mr. Blais' mother, and others that it used to fund payroll and pay vendors and other creditors. At one point, Mr. Blais told Mr. Jennings that he did not care about repaying the factoring companies because they were "faceless names" and was unconcerned about repaying Debbie Blais (an individual unrelated to Mr. Blais) because she had plenty of money and would not miss it.[3]

---

[3] The plaintiffs' narrative emphasizes Mr. Jennings' testimony that Mr. Blais told him he did not care about repaying certain creditors. Some of this testimony was credible. When asked whether Mr. Blais made statements about his attitude toward his creditors, Mr. Jennings confidently testified to statements that Mr. Blais made about the factoring companies and Debbie Blais. Mr. Jennings was unable to recall whether Mr. Blais made statements about other creditors until specifically prompted: "How about CED?" The testimony that followed, including testimony about Mr. Blais' attitude toward bankruptcy, was forced and unconvincing.

In 2017, DRB took on the following obligations:

| Date | Lender | Principal | Interest Rate | Term | Payment Schedule |
|------|--------|-----------|---------------|------|------------------|
| February 6, 2017 | Frank Morris | $75,000 | 5.00% | 22 days | Lump sum |
| February 24, 2017 | On Deck Capital | $145,000 | 46.67% | 18 months | $2,528 per week |
| May 1, 2017 | Gralan Property Group, LLC | $150,000 | 12.00% | 24 months | $7,061 per month |

As security for its obligations, DRB granted a lien on its accounts receivable to On Deck Capital. Around that same time, DRB sold or pledged a certain amount of its receivables in connection with money obtained from Funding Metrics. The debt to Funding Metrics had not been paid off by the time DRB filed for bankruptcy.

In the summer of 2017, Mr. Jennings began meeting with Mr. Blais on a weekly basis to go over DRB's accounts receivable and payable and the balances of DRB's outstanding debts. During these meetings, Mr. Blais was concerned, but emphasized the need to increase business and get cash flowing.

## VI.    Transfers by DRB to—or for the Benefit of—Mr. Blais.

Mr. Blais was paid a weekly salary by DRB for his work for the company. Mr. Blais determined what his salary would be and instructed Mr. Jennings to issue checks to him in that amount, net of deductions. In March 2015, Mr. Blais increased his salary to raise his weekly take-home pay from $1,500 to $1,750. DRB continued to pay that amount to Mr. Blais on a weekly basis until DRB ceased operations in 2017. In addition to his weekly salary, Mr. Blais used corporate funds to pay for some personal expenses. Sometimes, he instructed Mr. Jennings to write a check to cover a personal expense; other times he paid for a personal expense using DRB's credit or debit cards; occasionally he withdrew cash from DRB's account and used it to pay for personal expenses. Mrs. Blais also periodically presented Mr. Jennings with items

charged to her credit card—some for DRB expenses and some for personal expenses—that DRB reimbursed.  Corporate funds were used for a variety of personal items, including meals and alcohol, recreational expenses, and home improvements.

The profit and loss statements prepared by LDJ included an entry titled "Officer Wages" which represented the annual salary paid to Mr. Blais.  The amount reported as income on Mr. Blais' W-2 Forms was the sum of those "Officer Wages" and the amount of identified personal expenses paid with corporate funds, excluding the amounts treated as shareholder loan repayments.  The total amount withdrawn from DRB annually by Mr. Blais was the sum of the amounts shown on his W-2 Forms and the shareholder loan repayments.  Between 2011 and 2017, these amounts were as follows:

| Year | Officer Wages | Amount on W-2 | Loan Repayments | Total to Mr. Blais |
|------|--------------|---------------|-----------------|--------------------|
| 2011 | $102,632.34 | $129,428.77 | $20,660.00 | $150,088.77 |
| 2012 | $46,801.59 | $59,389.55 | $0.00 | $59,389.55 |
| 2013 | $113,151.50 | $170,588.32 | $7,246.00 | $177,834.32 |
| 2014 | $100,900.00 | $124,370.66 | $0.00 | $124,370.66 |
| 2015 | $120,713.34 | $120,713.34 | $3,238.01 | $123,951.35 |
| 2016 | $122,378.67 | $162,165.97 | $28,880.99 | $191,046.96 |
| 2017 | $148,159.00 | $148,159.00 | | |

At some point in 2015 or 2016, as DRB was slipping deeper into debt, Mr. Jennings recommended that Mr. Blais reduce his salary "to help DRB."  Mr. Blais refused.

Mr. Blais did not think about DRB's profitability when setting his compensation.  He focused more on the electrical work and his personal needs, and less on the company's books, and felt that DRB was doing okay so long as he was getting paid and paying creditors.  Mr. Blais was not insensitive to DRB's financial situation, however, and went without pay in some weeks, when necessary.  He worked hard and felt that he deserved what he took.  In his view, his compensation of around $160,000 in 2016 was "not a lot of money for somebody in [his]

10

position."  At times, he paid himself ahead of other creditors, explaining that he had to "stay focused" and that if he had been unable to cover personal expenses like housing and transportation, he would have been unable to run DRB.

In 2017, Mr. Blais' compensation of $148,159 was paid during the first nine months of the year, before DRB ceased operations.  This amount represented a year-over-year increase of approximately 35%.  These amounts were paid to Mr. Blais while DRB was on life support and increasing its borrowing.

**VII.    John Flatley Company.**

In 2016 and 2017, DRB entered into two contracts to do electrical work for the John Flatley Company.  Mr. Blais did not personally sign the contracts.  Instead, Mr. Jennings used a signature stamp and affixed the word "president" under the stamped signature of Mr. Blais.

The contracts between DRB and Flatley required DRB to hold payments from Flatley in trust for DRB's creditors.  Specifically, each contract provided that: "[DRB] further agrees that any monies [it] shall receive as payment for work performed under this Contract shall be received in trust and used to discharge [its] financial obligations with respect to such work."  Mr. Blais understood that the contracts obligated him to use the money paid to DRB by Flatley to pay suppliers and subcontractors for the Flatley jobs.  He did not pay much attention to the contracts, however, or read them word for word, because he had been doing business with Flatley for over 20 years.

In the summer of 2017, Flatley made three payments to DRB: $34,528 in June, $1,695 in July, and $3,010 in August.  In June, after DRB's existing bank account was attached by a creditor, Blais used the first payment from Flatley to open a new account at TD Bank.  He deposited all three payments from Flatley into that account, where they were commingled with

11

other funds.  This was Mr. Blais' general course of dealing with all funds received from Flatley, and other customers too.  The commingled funds were used to make outstanding payroll and payments to persons who had not supplied labor or materials for the Flatley project.  From the date the account was opened until the date DRB ceased doing business, DRB issued checks to Mr. Blais totaling $18,700, to Mr. and Mrs. Blais totaling $2,100, and to itself, to cash, and to others.  During this time, Mr. Blais also used the company debit card for personal expenses and ATM withdrawals.

CED sold goods on credit to DRB for the Flatley projects.  Mr. Blais did not use the funds received from Flatley to pay CED even though he understood that DRB was supposed to use the funds to pay CED, among others.

## VIII.  DRB's Final Transactions with CED.

On July 20, 2017, while its account with CED was on credit hold, DRB issued a check to CED in the amount of $16,050.  Around that same time, Mark Pepin, a credit manager at CED, reached out to Mr. Blais to discuss DRB's business, cash flow, future projects, and the possibilities for further collection on DRB's outstanding debt to CED.  These discussions continued for six weeks, during which time Mr. Blais reported that the company was doing well, he had funds coming in, he was completing work, and he expected to be able to take care of the debt to CED.[4]  DRB's credit status with CED did not change following Mr. Blais' report.

---

[4] Mr. Jennings testified that he overheard at least some of Mr. Blais' side of the conversations with Mr. Pepin and believed that Mr. Blais misrepresented DRB's prospects for paying CED.  The Court does not credit this testimony.  Mr. Blais may have been overly optimistic in his assessments, and Mr. Jennings may have disagreed with those assessments, but the Court does not find that Mr. Blais made an affirmative verbal misrepresentation in his conversations with Mr. Pepin.  And CED did not establish that it justifiably relied on any such misrepresentation in a way that damaged CED.  *See* McCrory v. Spigel (In re Spigel), 260 F.3d 27, 32 (1st Cir. 2001).

Mr. Blais tried "as hard as [he] could" to pay DRB's debt to CED.  But when additional payments were not forthcoming, Mr. Pepin set up a meeting with Mr. Blais during which they went over DRB's accounts receivable report and Mr. Pepin advised that if the debt was not paid, CED would begin reaching out to DRB's clients to verify its accounts receivable.

On August 21, 2017, DRB gave CED a check for $16,000.  Mr. Blais signed the check and personally delivered it to CED's office in Manchester.  At the time, Mr. Blais advised CED not to cash the check until Friday because he knew there was not enough in DRB's account for the check to clear.  He expected to receive sufficient funds to cover the check by Friday.  CED deposited the check without waiting, and it was dishonored for insufficient funds.  As it turns out, the check would have bounced even if CED had held it as Mr. Blais requested.

After the check was dishonored, Mr. Pepin again met with Mr. Blais to go over DRB's accounts receivable report, and to discuss when payments to DRB were expected and how much of each receivable would be going toward payroll, to other suppliers, and to CED.  In a meeting between Mr. Blais and Mr. Pepin in August 2017, DRB presented CED with a report indicating that DRB had outstanding accounts receivable of more than $200,000.  That report included duplicate invoices, invoices for work that had not been done, invoices that had already been paid, and invoices that were later reduced or voided.  The report overstated DRB's receivables by nearly $100,000.  The report did not cause CED to extend additional credit to DRB, but it did lead CED to suspend further collection activities for a couple of days.

## IX.     Chapter 7 Filings by DRB and Mr. Blais.

DRB ceased operating in September 2017.  Mr. Blais believed "right down to the end" that he could keep DRB going, and he had planned to do so.  The business failed not simply because of his salary and use of corporate funds for personal expenses, but because DRB had

customers that were not paying and jobs that had been underbid.  When Mr. Blais consulted a bankruptcy attorney in the fall of 2017, his goal was to pursue a chapter 11 case and keep DRB operating, but he and his counsel determined that option was not feasible.  Instead, DRB filed a chapter 7 petition in October 2017.

Question 30 on DRB's Statement of Financial Affairs ("SOFA") required it to disclose payments to insiders made within the year prior to the petition date.  DRB did not disclose any transfers to Mrs. Blais even though it made such transfers within the year leading up to the petition date.  On its schedules, DRB listed secured claims of approximately $180,000 and unsecured claims of more than $1 million.  After DRB's petition date, CED paid $4,500 to DRB's chapter 7 estate to settle a preference demand.  CED filed a proof of claim in DRB's case asserting an unsecured claim in the total amount of $143,253 arising out of the sale of goods on credit, including interest and costs and the payment it had made to settle the trustee's preference claim.  M&M also filed a proof of claim asserting an unsecured claim in the amount of $72,297.

In November 2017, Mr. Blais filed his own chapter 7 petition.  Mr. Blais listed his primary residence, which he owned jointly with Mrs. Blais, on his schedules with a value of $354,600.  They sold the home the following July for nearly $480,000.  Mr. and Mrs. Blais used the proceeds to pay off a mortgage and home equity loan, used the exempt funds to buy a new home, and used the remainder to pay off some of DRB's creditors, including Mr. Blais' brother-in-law and his mother.

## COUNT I

### I.    The Plaintiffs' Case Under 11 U.S.C. § 523(a)(2)(A).

Section 523(a)(2)(A) provides that "[a] discharge under section 727 . . . does not discharge an individual debtor from any debt . . . for money, property, services, or an extension,

renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or *actual fraud*[.]"  11 U.S.C. § 523(a)(2)(A) (emphasis added).  While the general narrative offered by the plaintiffs involves one or more alleged misrepresentations, Count I of their complaint alleges that DRB's transfers to Mr. Blais "in excess of a reasonable salary" constituted "actual fraud" by which Mr. Blais obtained money, property, services, and credit.

Because the plaintiffs offer a novel approach to section 523(a)(2)(A), a careful explication of their stratagem is warranted.  The plaintiffs start by training their sights on the term "actual fraud" in section 523(a)(2)(A).  They then pivot away from the Bankruptcy Code towards the Uniform Fraudulent Transfer Act ("UFTA").  They do this because UFTA allows transfers made with intent to hinder, delay, or defraud creditors to be avoided.  In the parlance of UFTA, these are often referred to as "actual intent fraudulent transfers," largely to distinguish them from other types of transfers that can be avoided under UFTA.  Transfers made with actual intent to hinder, delay, or defraud creditors sound like "actual fraud" to the plaintiffs' ears, and they go to great lengths analyzing the badges of fraud used by courts to assay intent to hinder, delay, or defraud.

Next, the plaintiffs address the requirement that something of value—money, property, services, or an extension, renewal, or refinancing of credit—be obtained through actual fraud. *See* 11 U.S.C. § 523(a)(2)(A).  Easily established here, say the plaintiffs, by the evidence of DRB's payments to Mr. Blais (or for his benefit).  Although the plaintiffs do not say as much explicitly, their argument rests on the notion that section 523(a)(2)(A) does not require that the

debtor—Mr. Blais—obtained anything from them.[5]

Having progressed this far, the plaintiffs next attempt to identify a "debt" that can be excepted from discharge under section 523(a).  The plaintiffs do not attempt to quantify Mr. Blais' liability to them by reference to UFTA:  they assert that their damages are not based on the amount of the fraudulent transfers, and that UFTA does not require a determination of the value fraudulently transferred.  Instead, they largely turn away from UFTA and raise several different theories of liability, including veil piercing, bad check law, and a statute addressing unfair trade practices.[6]  The plaintiffs believe that each of these theories establishes a right to payment and, therefore, a debt.  So far, so good, by the plaintiffs' lights.  Finally, the plaintiffs quantify the debts that they believe are excepted from discharge.  Each plaintiff seeks to have its *entire* claim, plus treble damages, attorney fees, and interest, excepted from discharge.[7]

This attempted mash-up is inspired by Husky International Electronics, Inc. v. Ritz, 136 S. Ct. 1581 (2016) and the decisions that followed on remand.  Since the early stages of this

---

[5] Mr. Blais is the debtor for purposes of section 523(a); he is the debtor in the Title 11 case that gave rise to this proceeding.  As will be explained in further detail below, DRB is the debtor for UFTA purposes.  Perhaps because they believe that DRB's corporate veil should be pierced, the plaintiffs treat Mr. Blais and DRB as one and the same.  The Court does not agree that veil piercing is warranted or that DRB should be treated as the alter ego of its insider.  *See* Norwood Grp., Inc. v. Phillips, 828 A.2d 300, 302 (N.H. 2003) (explaining that veil piercing is warranted "where the owners have used the corporate identity to promote an injustice or fraud on the plaintiffs").  Beyond that, conceptualizing the plaintiffs' theory of the case—which has its roots in fraudulent transfer law—is made even more difficult if one assumes that DRB and Mr. Blais are the same:  fraudulent transfer law *requires* a transferor and a transferee.

[6] Here, another wrinkle bears emphasis.  When the plaintiffs filed their complaint, DRB was itself a debtor in a chapter 7 case.  At the time, DRB's trustee had exclusive standing to seek to recover fraudulent transfers made by DRB, whether under 11 U.S.C. § 548 or under UFTA (through the portal of 11 U.S.C. § 544).  For this reason, the plaintiffs' effort to look beyond UFTA to establish a debt makes some sense (even if it is not ultimately successful).

[7] An additional note about the plaintiffs' theory deserves mention here.  Suppose that CED established that Mr. Blais, with the requisite fraudulent intent, tendered a worthless instrument in the amount of $16,000.  CED fails to explain how that would give rise to a nondischargeable debt for $143,000.

proceeding, the plaintiffs have consistently argued that the facts here are "virtually identical" to the facts in Husky and urged the Court to adopt an expansive interpretation of the Supreme Court's holding.

## II.     Actual Fraud Under 11 U.S.C. § 523(a)(2)(A) and the Scope of Husky.

In Husky, the Supreme Court held that "[t]he term 'actual fraud' in § 523(a)(2)(A) encompasses forms of fraud, like fraudulent conveyance schemes, that can be effected without a false representation." Husky Int'l Elecs., 136 S. Ct. at 1586. The Court did not rule that every fraudulent transfer constitutes "actual fraud" within the meaning of the statute or conclude that the debtor in the case was liable for a nondischargeable debt arising out of actual fraud. The Court's holding in Husky is that "actual fraud" does not invariably involve a misrepresentation.

On remand, the bankruptcy court fleshed out the facts: before Ritz's bankruptcy, Husky sold supplies to Chrysalis Manufacturing Corp., and Chrysalis incurred a debt to Husky of more than $160,000. Husky Int'l Elecs., Inc. v. Ritz (In re Ritz), 567 B.R. 715, 720 (Bankr. S.D. Tex. 2017). At the same time, Ritz, a shareholder and director of Chrysalis, orchestrated 176 transfers, totaling more than $1.1 million, out of Chrysalis' accounts and into the accounts of other entities that Ritz controlled. Id. at 720, 730. No value was received by Chrysalis for any of these transfers. Id. at 746. "[A]t all relevant times, Chrysalis was unable to pay its debts as they became due" and its liabilities exceeded the fair market value of its assets. Id. at 725-26. Chrysalis did not pay its debt to Husky and filed a chapter 7 petition. Id. at 720. Husky then sued Ritz, seeking a judgment against him under § 21.223(b) of the Texas Business Organization Code ("TBOC"), a veil-piercing statute applicable when "actual fraud" has occurred. See id. at 721, 728. Ritz then filed his own chapter 7 petition, and Husky filed an adversary proceeding

against Ritz seeking a determination that the debt owed by him was excepted from discharge under section 523(a)(2)(A).  Id. at 721.

Before Husky, the First Circuit Court of Appeals held that a "debt for money or property 'obtained by . . . actual fraud' extends beyond debts incurred through fraudulent misrepresentations to also include debts incurred as a result of knowingly accepting a fraudulent conveyance that the transferee knew was intended to hinder the transferor's creditors."  Sauer Inc. v. Lawson (In re Lawson), 791 F.3d 214, 216 (1st Cir. 2015).  When the debt in question is owed by a debtor who received an allegedly fraudulent transfer, the debt will be excepted from discharge under section 523(a)(2)(A) if the debtor-transferee colluded in the fraud and knew that the transfer was intended to thwart the transferor's creditors.  Id. at 220.

This type of coordinated fraud occurred in McClellan v. Cantrell, 217 F.3d 890 (7th Cir. 2000)—a decision cited by the Supreme Court in Husky and by the First Circuit in Lawson. McClellan sold certain machinery to a buyer for $200,000 and provided purchase money financing.  Id. at 892.  After defaulting on his obligations to McClellan, the buyer sold the assets to his sister, Cantrell, for $10, while he was being sued by McClellan.  Id.  Cantrell "knew about the suit and in accepting the transfer of the machinery was colluding with her brother to thwart McClellan's collection of the debt that her brother owed him."  Id.  After the transfer, Cantrell sold the machinery for $160,000, and would not reveal "what . . . happened to that money."  Id. McClellan sued her, "claiming that her brother's transfer of the machinery to her had been a fraudulent conveyance."  Id.  While that suit remained pending, Cantrell filed a chapter 7 petition.  Id.  McClellan then initiated an adversary proceeding seeking a determination that Cantrell owed him a debt that was nondischargeable under section 523(a)(2)(A).  Id.  The

18

Seventh Circuit reversed the trial court's dismissal of the complaint, explaining that the "two-step routine" alleged by McClellan—

> in which Debtor A transfers valuable property to B for nothing in order to keep it out of the hands of A's creditor and B then sells the property and declares bankruptcy in an effort to shield herself from liability for having colluded with A to defeat the rights of A's creditor—is as blatant an abuse of the Bankruptcy Code as we can imagine.

Id. at 893.  The appellate court noted that the debt that McClellan sought to collect from Cantrell was not the brother's original debt that arose from the loan but was instead "the debt that [Cantrell] incurred to McClellan by committing a fraud against him." Id. at 895.  Because that fraud was "an actual fraud, the debt that it gave rise to [was] not dischargeable." Id.

The plaintiffs have tried to establish that this case is just like Husky.  But it is not (and it is not like Lawson or McClellan either).  The case presented by the plaintiffs amounts to an excessive compensation case and, in some respects, resembles constructive fraud fact patterns in which an insider operates an entity with unreasonably small capital.  The transfers in question here consisted of payroll, expenditures accounted for as additional compensation to the corporate insider, and repayment of shareholder loans.  By contrast, the transfers in Husky were not made in exchange for any value given to the corporation.  In re Ritz, 567 B.R. at 746.  They were made solely to benefit the insider at the expense of the corporation's creditors.  In this case, while DRB was transferring funds to Mr. Blais, it was also paying creditors and keeping at least some of its debts current at least some of the time.  In Husky, the corporation was never able to pay its debts as they became due.  This case is also distinguishable from Husky in a legal sense, insofar as the text of the TBOC overlaps neatly with section 523(a)(2)(A):  both require a showing of "actual fraud."  Additionally, the TBOC operates to make the insider liable for the entire amount of the creditor's claim against the entity.  None of the theories of liability invoked by the plaintiffs here

overlap quite so precisely.  Ultimately, however, it is not the distinctions between this case and

Husky that doom Count I of the complaint.  Count I fails because the plaintiffs did not prove that

Mr. Blais orchestrated transfers from DRB to himself (or for his benefit) with the actual intent to

defraud the plaintiffs.

### III.    Actual Intent Fraudulent Transfers Under New Hampshire Law.

The plaintiffs ground their effort to establish "actual fraud" in a statute entitled "Transfers

Fraudulent as to Present and Future Creditors" which provides that:

> I. A transfer made or obligation incurred by a debtor is fraudulent as to a creditor,
> whether the creditor's claim arose before or after the transfer was made or the
> obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> (a)  [w]ith actual intent to hinder, delay, or defraud any creditor[.]

N.H. R.S.A. § 545-A:4(I)(a).  Actual fraud for purposes of UFTA "requires proof that 'the debtor

made the transfer . . . with actual intent to hinder, delay, or defraud any creditor of the debtor.'"

Dahar v. Jackson (In re Jackson), 318 B.R. 5, 13 (Bankr. D.N.H. 2004) (quoting § 545-

A:4(I)(a)).  According to the official commentary to the uniform version of this statute:

> The phrase "hinder, delay, or defraud" . . . is potentially applicable to any
> transaction that unacceptably contravenes norms of creditors' rights.  [The statute]
> is sometimes said to require "actual fraud," by contrast [with other sections of
> UFTA], which are said to require "constructive fraud."  That shorthand is highly
> misleading.  By its terms, [the statute] applies to a transaction that "hinders" or
> "delays" a creditor, even if it does not "defraud" the creditor.  "Hinder, delay, or
> defraud" is best considered to be a single term of art describing a transaction that
> unacceptably contravenes norms of creditor's rights.  Such a transaction need not
> bear any resemblance to common-law fraud.

Unif. Voidable Transactions Act § 4 cmt. 8 (2014) (citations omitted). The statute focuses

on the transferor's intent *at the time of the transfers*.  In re Jackson, 318 B.R. at 13.

"It is often impracticable, on direct evidence, to demonstrate an actual intent to hinder,

delay, or defraud creditors."  Max Sugarman Funeral Home, Inc. v. A.D.B. Investors, 926 F.2d

1248, 1254 (1st Cir. 1991).  As such, courts often evaluate the transferor's intent based on "the circumstances surrounding the transfer, taking particular note of certain recognized indicia or badges of fraud[.]"  Id. (citations omitted).

> In determining actual intent under [N.H. R.S.A. § 545-A:4(I)(a)], consideration may be given, among other factors, to whether:
>
> (a)  The transfer or obligation was to an insider;
>
> (b)  The debtor retained possession or control of the property transferred after the transfer;
>
> (c)  The transfer or obligation was disclosed or concealed;
>
> (d)  Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
>
> (e)  The transfer was of substantially all the debtor's assets;
>
> (f)  The debtor absconded;
>
> (g)  The debtor removed or concealed assets;
>
> (h)  The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
>
> (i)  The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
>
> (j)  The transfer occurred shortly before or after a substantial debt was incurred; and
>
> (k)  The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

N.H. R.S.A. § 545-A:4(II).  This list is a "'nonexclusive catalogue'" of the badges of fraud that may be considered by the court "'in determining whether the debtor had an actual intent to hinder, delay, or defraud one or more creditors.'"  In re Jackson, 318 B.R. at 13 (quoting Unif. Fraudulent Transfer Act § 4, cmt. 5, 7A U.L.A. 654 (2004)).

> The law . . . allows the badges to act as a substitute for direct proof of intent and permits, but does not require, the fact finder to draw inferences of bad intent from them.  Any badge of fraud is potentially relevant to proving fraudulent intent, but no single badge alone creates a presumption of bad intent.

In re Jackson, 318 B.R. at 14.  "The fact finder must consider the totality of the circumstances surrounding a transfer, including any evidence negating intent."  Id.  A "single badge of fraud may spur mere suspicion; the confluence of several can constitute conclusive evidence of an actual intent to defraud, absent significantly clear evidence of a legitimate supervening purpose."  Max Sugarman, 926 F.2d at 1254-55 (citations and quotation marks omitted).

In a typical fraudulent transfer case, the plaintiff challenges a specific transfer and identifies that transfer by date and amount.  See Harman v. Sorlucco (In re Sorlucco), 68 B.R. 748, 753 (Bankr. D.N.H. 1986) (noting that fraudulent transfer concepts are "normally applied in commercial settings—in which a 'snapshot picture' of the dollar value of the assets transferred and received is weighed by the bankruptcy court").  Here, the plaintiffs do not clearly identify the transfers they are challenging.  At times, they appear to contest transfers made by DRB to Mr. Blais (or for his benefit) during the entire period from 2011 to 2017.  For example, they contend that "some or all" of the compensation paid to Mr. Blais between 2011 and 2017 (totaling over $900,000) consisted of fraudulent transfers under UFTA.  At other times, they focus more particularly on transfers made between 2015 and 2017, solely in 2017, or in the final months of DRB's operations.  This imprecision is puzzling given the plaintiffs' request for a determination that debts, in specific amounts, are excepted from discharge.

Ultimately, the plaintiffs emphasize the evidence that, in their view, establishes fraudulent intent without linking that intent to specific transfers giving rise to a nondischargeable debt.  If the plaintiffs had proved fraudulent intent, their failure to challenge specific transfers would thwart their quest for a judgment in their favor.  But all of the attention and most of the

arguments have been focused on fraudulent intent.  The plaintiffs argue that the record contains direct evidence of fraudulent intent as well as evidence supporting an inference of fraudulent intent (when that evidence is viewed through the prism of the badges of fraud).  These arguments are methodically addressed, in turn.

### a.  Direct Evidence of Fraudulent Intent.

The plaintiffs urge the Court to find that, from 2014 onwards, Mr. Blais "took DRB on a borrowing binge that saw it run up an unsustainable level of debt" while using "the borrowed funds to siphon off ever-increasing amounts from DRB for his own benefit" and did so with no intention of repaying the debts, in a deliberate scheme to use bankruptcy to discharge the debts and "give himself a clean slate."  To support this perspective, the plaintiffs assert that Mr. Jennings testified that Mr. Blais stated that "he was borrowing money from certain creditors that he was deliberately planning not to repay."  The Court will not make these findings and does not share the plaintiffs' view of Mr. Jennings' testimony.  The plaintiffs may have proved desperation by Mr. Blais, but they did not put on credible direct evidence of fraud.  Yes, Mr. Blais told Mr. Jennings that he did not care about paying certain creditors, but his statements do not establish that Mr. Blais never had any intention of paying those creditors.  Overall, the evidence is less suggestive of the premeditated scheme envisioned by the plaintiffs than it is of a business struggling and an insider coming to terms with that reality and trying to justify the likelihood that not all debts would, in fact, be paid.  The plaintiffs' narrative is not compelled by the record, and it discounts the evidence that Mr. Blais was working and DRB was paying creditors—and attempting to pay creditors—until just before it sought bankruptcy relief.  As Mr. Blais credibly testified, the business did not fail solely because it paid him more than the

plaintiffs now deem reasonable.  Even if DRB had reduced his compensation, it may still have failed for multiple reasons, including underperforming projects.

### b. Badges of Fraud.

Do the badges, when considered together, constitute conclusive evidence that Mr. Blais committed actual fraud when he caused DRB to make transfers to him?  The short answer is no. Unpacking this answer requires an examination of each of the badges raised by the plaintiffs. Before diving in, a few prefatory notes about UFTA and badges of fraud are warranted.  First, the analysis of the badges is not a mathematical exercise in which the factfinder simply checks "yes" or "no" for each badge and then compares the results to produce a definitive answer. Instead, the badges of fraud are tools used by courts to help analyze the evidence presented to answer the ultimate question, namely, whether a specific transfer was made with intent to hinder, delay, or defraud creditors. The statutorily identified badges are not talismanic, and the court must resolve the factual question of intent based on its assessment of all the evidence.  Second, in addressing the badges of fraud, the "debtor" to whom UFTA refers is DRB as the transferor (not Mr. Blais as the transferee).[8]

### i. Badge #1: The transfer was to an insider.

Mr. Blais was an insider of DRB.  *See* N.H. R.S.A. § 545-A:1(VII)(b) (defining "insider" to include, if the debtor is a corporation, an officer, director, or person in control of the debtor).

---

[8]  As noted, Mr. Blais is the debtor in the chapter 7 case.  But, for UFTA purposes, DRB was the debtor and the transferor, and Mr. Blais was the transferee.  Rather than conflating or blurring the distinctions between Mr. Blais and DRB, the Court will apply the statute as written.  *See* N.H. R.S.A. § 545-A:4(I)(a) (focusing on the intent of the person who made the transfer).  That said, the Court is not insensitive to the notion that Mr. Blais' intent may be imputed to DRB because, as a practical matter, he was the individual with exclusive control over the disposition of DRB's funds.  *See* Consove v. Cohen (In re Roco Corp.), 701 F.2d 978, 984 (1st Cir. 1983) ("We may impute any fraudulent intent of Consove to the transferor Roco because, as the company's president, director, and sole shareholder, he was in a position to control the disposition of its property.").

As such, all transfers by DRB to Mr. Blais were transfers to insiders.  The plaintiffs believe that this first badge is possibly the most important.  They point out that when Husky was remanded, the bankruptcy court suggested that this "badge is so significant that in some cases an insolvent debtor's transfer to an insider has caused the court to make a finding of actual fraud in the absence of any other badges of fraud." In re Ritz, 567 B.R. at 743 (quotation marks omitted).  There may be cases in which the nature of a transfer, as one made to an insider, should weigh more heavily.  And Husky may have been one of those cases.  But, as already explained, this case is not like Husky.  Beyond that, the notion that a transfer to an insider might be determinative in establishing actual fraud cannot be squared with this Court's declaration in Jackson that no single badge alone gives rise to a presumption of fraud, and that the inquiry under the badges of fraud is a holistic one.  See In re Jackson, 318 B.R. at 14; see also Unif. Voidable Transactions Act § 4 cmt. 6 (suggesting that a transfer to a closely related person is not presumptive evidence of fraudulent intent but may warrant close scrutiny).  That said, this first badge does weigh in the plaintiffs' favor to a limited extent.

### ii.  Badge #2: The debtor retained possession or control of the property transferred after the transfer.

The debtor, DRB, did not retain possession or control of the property transferred after the transfer.  The funds in question were transferred to Mr. Blais (or to others for his benefit).  This badge does not weigh in the plaintiffs' favor.

### iii.  Badge #3: The transfer was disclosed or concealed.

The transfers in question were not concealed, and this badge does not weigh in favor of a finding of fraudulent intent, although the plaintiffs make several arguments to the contrary.

First, the plaintiffs point out that: (a) DRB's SOFA called for disclosure of transfers made by DRB to any person, within two years prior to the petition date, other than transfers

made in the ordinary course of business; and (b) DRB failed to disclose that, during that period, it transferred more than $300,000 to Mr. Blais.  They also assert that DRB's Schedule B should have disclosed that DRB might have a cause of action against Mr. Blais arising out of improper transfers to him.  The plaintiffs seem to believe that these nondisclosures amount to concealment of the transfers to Mr. Blais within the meaning of UFTA.  To support their perspective, the plaintiffs refer to Husky on remand, where the bankruptcy court concluded that Ritz had concealed transfers from the corporation's creditors by failing to disclose those transfers on the corporation's SOFA or any potential cause of action against him relating to those transfers on the corporation's Schedule B.  In re Ritz, 567 B.R. at 748-49.

The Court is unpersuaded: the nondisclosures identified by the plaintiffs are not as problematic as they contend.  Unlike the transfers in Husky, the transfers by DRB to Mr. Blais within the two years prior to the petition date are not clearly transfers outside of the ordinary course of DRB's business.  Mr. Blais was an officer and employee of the company and DRB regularly paid him a salary and repaid any shareholder loans that he extended to the company. Beyond that, the nondisclosures in question occurred when DRB filed its schedules and statements in October 2017.  To the extent that Mr. Blais' use of corporate funds for personal expenses fell outside of the ordinary course of DRB's business, DRB's failure to disclose those transfers on its SOFA is not strongly probative of DRB's intent vis-à-vis its creditors at the time of the transfers now challenged by the plaintiffs.[9]

The plaintiffs next point out that Mr. Blais never informed them that DRB's liabilities exceeded its assets, that DRB was unprofitable, that DRB's retained earnings were increasingly

---

[9] Bear in mind that the plaintiffs appear to contend that all transfers by DRB to Mr. Blais during 2011 are avoidable under UFTA.  The accuracy and completeness of DRB's bankruptcy schedules, filed in 2017, has little, if any, probative value on the question of DRB's intent when it made transfers in 2011. The same conclusion holds with respect to transfers made in some of the other years as well.

negative, or that he was using DRB's funds for personal expenses.  In the plaintiffs' view, Mr. Blais' failure to make these disclosures amounts to concealment of the transfers in question.  But the plaintiffs have not identified any provision of law that would have required these disclosures. In the absence of such law, this alleged shortcoming does not establish a "concealment" for purposes of New Hampshire fraudulent transfer law.  *See* Swan v. Hickey, No. 99-C-0231, 2000 WL 33915976, at *2 (N.H. Super. Ct. Nov. 17, 2000) (rejecting plaintiff's claim that the defendant concealed a transfer of a residence by failing to notify the plaintiff "personally of the marital action or of the resulting decree awarding her the marital home" in the absence of any provision of law requiring such notification).

### iv.  Badge #4: Before the transfer was made, the debtor had been sued or threatened with suit.

Some of the transfers in question occurred after DRB's bank account was attached by a creditor and Mr. Blais opened a new account for DRB.  The plaintiffs ask the Court to infer that the checks issued to Mr. Blais, to Mr. and Mrs. Blais, to DRB, and to cash, and at least some of the debit charges and ATM withdrawals were funds improperly "siphoned off" of the business after the account was attached.  DRB made some transfers to insiders in the roughly three-month period between the time that its account was attached and the time that it ceased doing business. That much is established.  Beyond that, however, the plaintiffs have not established that the transfers were improper.  As such, this badge does not weigh heavily in the overall calculus.

### v.  Badge #5: The transfer was of substantially all the debtor's assets.

The plaintiffs have not established that DRB transferred substantially all of its assets to Mr. Blais.  In their argument to the contrary, the plaintiffs compare the value of the assets shown on DRB's year-end balance sheets between 2011 and 2017 with the total sum that DRB transferred to Mr. Blais during that timeframe.  They claim that this comparison, along with

DRB's insolvency during this period, amounts to a showing that DRB gave the great majority of its assets to Mr. Blais.  This comparison is not as revealing as the plaintiffs believe.

With the transfers challenged by the plaintiffs ill-defined, tidy analysis is hampered.  This problem is amplified here by the plaintiffs' loose effort to lump together all corporate transfers to Mr. Blais over a six-year period.  Transfers spanning six years cannot be lumped together and challenged wholesale in the manner attempted by the plaintiffs because fraudulent transfer law is transfer specific.  *See* N.H. R.S.A. § 545-A:4 (focusing throughout on "the transfer").  Moreover, the sum of DRB's transfers to Mr. Blais over time cannot be meaningfully contrasted with the company's year-end balance sheets to support a determination that DRB transferred substantially all corporate assets to Mr. Blais.  The assets shown on DRB's balance sheets are valued at a point in time, in a specific way, presumably in accordance with generally accepted accounting principles.  The record does not reveal what these assets included, but it is hard to imagine that the company owned no supplies, inventory, equipment, or other tangible items.  There was no showing that DRB gave Mr. Blais nearly all assets of the corporation at any point in time.  What was shown were regular payments of salary by DRB to Mr. Blais along with reimbursements for Mr. Blais' shareholder loans to the company, and Mr. Blais' use of corporate funds for personal expenses (which use was accounted for either as compensation or as a shareholder payable).  These transfers from DRB to Mr. Blais took place over time.  The plaintiffs' attempt to pit apples against oranges is unavailing.

Taking a different tack, the plaintiffs cite In re Coffey's Case, 949 A.2d 102 (N.H. 2008), for the proposition that, under New Hampshire law, this badge is established where the transfer in question results in insolvency.  This case is easily distinguishable from Coffey's Case, where, on the eve of his suspension from the practice of law, Mr. Coffey transferred all of his interests

in three pieces of real property and all the contents of those properties into a trust, leaving him owning no property whatsoever.  Id. at 107-09.  Here, by contrast, it appears that DRB owned assets, the value of which fluctuated over the years, and that, while it owned those assets, it paid compensation to Mr. Blais that also fluctuated over the years.  This badge does not help the plaintiffs in their effort to establish fraudulent intent.

### vi.   Badge #6: The debtor absconded.

DRB did not abscond.  It operated as a going concern and then ceased operations.  The plaintiffs concede that this badge does not support a finding of fraudulent intent.

### vii.   Badge #7: The debtor removed or concealed assets.

This badge does not weigh in the plaintiffs' favor; their arguments to the contrary are not persuasive.  As with the third badge of fraud (which concerns whether the transfers were concealed), the plaintiffs make much of Mr. Blais' failure to inform them of DRB's financial situation and his use of DRB's funds for personal expenses.  But these nondisclosures signify much less than the plaintiffs believe.  They do not amount to proof of concealment in the absence of any identified legal principle requiring DRB to keep its unsecured creditors so informed.  The plaintiffs also suggest that DRB "secretly transferred assets" to Mr. Blais.  But the payments made by DRB to Mr. Blais were not secret transfers; most took the form of payroll, some constituted reimbursement for Mr. Blais' loans to the company, and others amounted to Mr. Blais' use of corporate funds for personal expenses—uses accounted for by DRB's bookkeeper and reflected on Mr. Blais' tax returns.  DRB's creditors, including the plaintiffs, must have assumed that DRB was compensating Mr. Blais for his services.  The payments were not so "secret" as they now contend.

### viii.  Badge #8: The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred.

Before reaching a conclusion or addressing the plaintiffs' arguments respecting this badge, it is necessary to unpack the concept of reasonably equivalent value.  A determination of reasonably equivalent value under 11 U.S.C. § 548—the Bankruptcy Code's analogue to UFTA—involves two steps, "requiring the court to first determine whether the debtor received value, and then examine whether the value is reasonably equivalent to what the debtor gave." Grossman v. Durham Commercial Capital Corp. (In re Connolly Geaney Ablitt & Willard, PC), 614 B.R. 133, 153 (B.A.P. 1st Cir. 2020) (quotation marks omitted).  Reasonably equivalent value assessments are a gestalt, informed by all the circumstances surrounding the transaction. Id.  "Because fraudulent transfer law's purpose is to preserve the debtor's estate for the benefit of unsecured creditors, courts evaluate transfers from the creditors' perspective, measuring value at the time of the transfer[.]"  DeGiacomo v. Sacred Heart Univ. (In re Palladino), 942 F.3d 55, 59 (1st Cir. 2019).  Under the two-step framework, "[i]f the court determines that some value was exchanged, it should then compare what was given with what was received."  In re Connolly Geaney Ablitt & Willard, 614 B.R. at 154 (quotation marks omitted).  In this comparison, the court should consider "both direct and indirect benefits."  Nickless v. Pappas (In re Prime Mortg. Fin., Inc.), BAP No. MW 10-035, 2011 WL 4572006, at *4 (B.A.P. 1st Cir. Feb. 14, 2011).

The analysis begins with whether DRB received value.  In 2017, DRB received direct value from Mr. Blais in the form of his services as an electrician performing work for the

company, enabling it to earn income.[10]  Mr. Blais also provided some indirect value to the company because his relationships with customers enabled the company to obtain work.  In return for Mr. Blais' efforts, DRB paid him a salary.  When DRB closed its doors in September 2017, Mr. Blais had received a total of $148,159 for his work for the company over the course of nine months.  Value was exchanged that year, and in the prior years.

The second step of the reasonably equivalent value analysis involves a comparison of the value received by DRB and the value given up by DRB.  Were the benefits provided to the company by Mr. Blais reasonably equivalent to the amount that he received?  The plaintiffs assert that the Court should reduce any value Mr. Blais' services provided to DRB by the detriment he caused to DRB "by his deliberate or reckless conduct in running up unsustainable debt to allow him to divert ever-increasing amounts of corporate funds to personal use."  They contend that the "evidence mandates a finding that the net economic effect of the transfers [Mr.] Blais made to himself was depletion of DRB's assets and bankruptcy."  The evidence does not mandate these findings and does not even justify them.

This proceeding is not a referendum on Mr. Blais' business practices generally.  *Cf.* McCrory v. Spigel (In re Spigel), 260 F.3d 27, 32 (1st Cir. 2001) ("[T]he Bankruptcy Code does not condition discharge upon a generalized determination of the moral character of the debtor.").  Yes, DRB's liabilities nearly doubled between 2014 and 2017, it took on loans with onerous credit terms, and its debts became unmanageable.  And, from 2015 to 2017, the funds transferred by the corporation to Mr. Blais in an average month increased.  There is a correlation, but the

---

[10]  Mr. Blais testified that, at times, he was working 70 hours per week.  The Court infers that he was in fact working full time until DRB ceased operations in the fall of 2017.  The plaintiffs concede, as they must, that DRB received some value from Mr. Blais' efforts.  They assert—without any evidence—that Mr. Blais' services may have been less valuable to DRB than the services of other individuals employed by DRB.

plaintiffs did not establish causation.  Mr. Blais credibly testified that DRB's failure was not caused by the corporate transfers to him but was instead attributable to customers not paying and losing money on jobs.

The plaintiffs contend that Mr. Blais should bear the burden of proving the value of his services to the company given his status as an insider, DRB's insolvency, and the fact that his salary was not set at arms-length.  They insist that this burden shift is warranted by fundamental fairness and by a handful of non-binding cases that they deem persuasive.  The Court is not persuaded.  *See* Unif. Voidable Transactions Act § 4(c) & cmt. 11 (allocating burden of persuasion on fraudulent transfer claim to plaintiff and warning that courts "should not apply nonstatutory presumptions that reverse that allocation" because doing so undermines the law's uniformity).  Further, even if the authorities cited by the plaintiffs were binding, there are not enough other badges of fraud here to warrant a burden shift.

The plaintiffs bear the burden of establishing actual fraud under section 523(a)(2)(A).  *See* In re Spigel, 260 F.3d at 32 ("As the party seeking to prevent Spigel from discharging his debt to them, the McCrorys bear [the] burden to show that Spigel's debt comes squarely within an exemption from discharge.").  The plaintiffs have assumed the burden of utilizing the badges of fraud to prove fraudulent intent and they have attempted to show that the value given by DRB to Mr. Blais was not reasonably equivalent to the value that Mr. Blais gave to DRB.  They did not make this showing.

In their complaint, the plaintiffs assert that a reasonably equivalent value for Mr. Blais' services to DRB would have been a weekly salary of $1,500 at most.  In their post-trial brief, they assert that a "reasonable salary" for Mr. Blais would have been "$90,000 per year, more or less" based on the assumption that a salary in that ballpark would have been enough for Mr.

Blais to live on.  Stripped to its essence, this is the plaintiffs' whole case—an excessive compensation case.  But they did not offer a shred of evidence suggesting that other similarly situated electricians in New Hampshire make approximately $90,000 per year.  They also failed to explain why DRB should have paid Mr. Blais the same amount every year, regardless of the number of hours he worked, his productivity, increases in the costs of living, or any of the other myriad factors that often go into determining a worker's compensation.  They did not prove why their preferred figures—rather than some other figures—would have been reasonable.  This badge does not weigh in the plaintiffs' favor.

### ix.  Badge # 9: The debtor was insolvent or became insolvent shortly after the transfer was made.

DRB's liabilities exceeded the value of the assets shown on its balance sheets from 2011 to 2017.  The parties stipulated to this fact.  But balance sheets do not always reflect the fair value of assets or necessarily establish insolvency for UFTA purposes.  *See* N.H. R.S.A. § 545-A:2(I) ("A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation.").  The plaintiffs contend that this badge should be weighted heavily in favor of a finding of fraudulent intent because business owners "have leeway to reap the rewards of their entrepreneurship when their business is solvent" but must prioritize creditors in the event of insolvency.  In support of this argument, they refer to New Hampshire's statutory limitations on distributions to shareholders in the event of corporate insolvency, N.H. R.S.A. § 293-A:6.40(c).  This statute does not support the plaintiffs' case.  There was no evidence that DRB ever made *distributions* to its insiders; instead, it compensated Mr. Blais for his services and repaid its insiders for shareholder loans.  The plaintiffs did not build their case around any legal principle requiring a corporate insider to forego or reduce the compensation provided by the corporation for insider services whenever the corporation's liabilities exceed its assets.  The fact

33

that DRB continued to pay Mr. Blais for his services in 2017 (and even paid him more in 2017 than in 2016) as its liabilities mounted does not clearly indicate that DRB intended to defraud its creditors.

> ### x. Badge #10: The transfer occurred shortly before or after a substantial debt was incurred.

DRB's transfers to Mr. Blais in 2017 took place as DRB was taking on additional debts, including the debts to CED and M&M arising out of the purchase of goods on credit, and the obligations to Frank Morris, On Deck Capital, and Gralan Property Group.  The terms of some of these loans were onerous, leaving the impression that Mr. Blais was desperate to keep the corporation running—both to provide him with the means to earn a living and with the ability to pay existing creditors.  In the aggregate, these debts were substantial.  But the timing of the transfers to Mr. Blais in 2017, after these debts were incurred, does not strongly suggest that DRB was paying Mr. Blais with the intent to defraud its creditors.  While DRB was paying Mr. Blais, it was also paying other employees for their services and paying other legitimate business debts.  On this record, this badge of fraud is not entitled to substantial weight.

> ### xi. Badge #11: The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

There is no evidence that such transfers occurred, and the plaintiffs concede as much. This badge does not weigh in favor of a finding of fraudulent intent.

> ### xii. Additional Badge — #12: Mr. Blais used fabricated accounts receivable to deceive CED and routinely inflated accounts receivable reports.

The plaintiffs point to DRB's practice of generating inaccurate receivables reports, and specifically pinpoint the inaccurate report that Mr. Blais presented to CED in August 2017, asserting that this shows that DRB maintained fraudulent intent toward its creditors.  As part of

this effort, the plaintiffs catalogue the invoices listed on the August 2017 report that were later voided, and then assert that the report was further fabricated because DRB did not own any of the receivables, having previously sold them to Funding Metrics and encumbered them by granting On Deck Capital a lien on all business assets.[11]  The inflated accounts receivable reports are troubling, but they are not so indicative of actual fraud within the meaning of UFTA and section 523(a)(2)(A) as the plaintiffs believe.  Mr. Blais credibly testified that some invoices sent to clients were later paid in a reduced amount following negotiations with those clients.  His practice of advance invoicing, although problematic, made some degree of sense with respect to small residential projects capable of being completed within a day or two.  That practice with respect to larger projects is far less understandable and raises an eyebrow.  That said, there was no credible evidence that Mr. Blais presented inflated receivable reports to creditors other than CED (and, even if such evidence existed, it is far from clear that the plaintiffs can complain under the rubric of section 523(a)(2)(A) about injuries to other creditors).[12]  As for the inflated report presented to CED, it by itself does not constitute actual fraud within the meaning of section 523(a)(2)(A) because it qualifies as a statement respecting DRB's financial condition.  *See* 11 U.S.C. § 523(a)(2)(A) (carving out debts for money obtained by a fraudulent statement

---

[11]  The plaintiffs do not address UFTA's exclusion of encumbered assets from the statutory definition of "asset" (which, in turn, provides meaning for the important statutory term "transfer").  *See* N.H. R.S.A. § 545-A:1(II) (defining asset to exclude property "to the extent it is encumbered by a valid lien"); *see also* id. § 545-A:1(XII) (defining transfer to mean "every mode . . . of disposing of or parting with an asset").  If DRB's receivables were encumbered in 2017, it is possible, if not likely, that the identifiable cash proceeds of those receivables were also encumbered.  If so, then any subsequent transfer of the encumbered proceeds to Mr. Blais—whether by way of payroll check or ATM withdrawal—could not have been a fraudulent transfer under UFTA.  *See* Ed Peters Jewelry Co. v. C & J Jewelry Co., 124 F.3d 252, 262 (1st Cir. 1997).

[12]  At one point, Mr. Jennings testified that he had learned, at some unidentified point in time, that Mr. Blais used inflated accounts receivable reports to entice creditors to loan to him.  He did not identify when he learned this information, or when those reports were given to which creditors.  His testimony was somewhat contrived and not particularly specific.  It was, therefore, not credible.

respecting the debtor's or an insider's financial condition from debts that would be otherwise excepted from discharge under the statute).  Beyond that, although the report given to Mr. Pepin may shine some light on DRB's intentions as to CED as of August 2017, the report is not strongly probative of whether DRB intended to defraud CED when it made payments to Mr. Blais beginning in 2011 and continuing for the six years that followed.

### xiii.  Additional Badge — #13: Mr. Blais failed to list transfers to insiders on DRB's bankruptcy schedules.

DRB's SOFA did not disclose insider transfers to Mrs. Blais even though DRB made such transfers within the year prior to the petition date.  Although DRB's SOFA disclosed certain transfers to Mr. Blais within the year prior to the petition date, the plaintiffs claim that DRB understated the amount transferred to Mr. Blais by approximately $60,000.  They contend that these inaccuracies constitute an additional badge of fraud.  As with the plaintiffs' theory respecting the third badge of fraud, the Court concludes that the inaccuracies in DRB's schedules are not substantially probative of DRB's intent at the time that the transfers occurred.  The inaccuracies may be problematic for purposes of bankruptcy administration.  But they do not constitute a badge of fraud as to transfers generally or as to any specific transfer.

### xiv.  Additional Badge — #14: Mr. Blais failed to amend his schedules when he and his wife sold their house for a price approximately 35% more than the value shown on his schedules.

The question that the badges are designed to help answer is whether DRB intended to defraud creditors when it made transfers to Mr. Blais.  The fourteenth badge raised by the plaintiffs does not help answer this question.  It is not clear that any undervaluation was intentional.  Mr. Blais is not the first debtor to provide a value on his schedules that proves incorrect after the passage of time (and he will not be the last).  If the plaintiffs wanted to capture

any non-exempt, unencumbered value in the house, they should have sought relief in Mr. Blais'
bankruptcy case. This badge does not weigh in their favor.

> **xv. Additional Badge — #15: Mr. Blais engaged in a course of conduct by
> which he financed his family's lifestyle by inducing creditors to make
> loans to a business and using the loan proceeds for personal use
> without disclosing that to the creditors.**

This badge, as formulated by the plaintiffs, is their grand theory of this case. They would
like the Court to find that DRB bilked its creditors, duping them into the belief that they were
making loans or extending credit for legitimate business purposes, while DRB instead funneled
money to Mr. Blais to support his personal life. The Court will not make that finding. Yes,
DRB paid Mr. Blais for his services while DRB was insolvent. Some of the funds loaned to the
company were used to make those payments; other funds were used to pay other employees,
taxing authorities, and suppliers. Corporate payments to Mr. Blais for services were legitimate
business expenses. Mr. Blais' use of corporate funds for personal expenses may have been
improper and certainly was not a best practice, but it was ultimately accounted for as additional
compensation.[13] The plaintiffs have not identified any legal principle requiring a company to
reduce or eliminate compensation to its insider as it approaches or digs itself deeper into
insolvency. The plaintiffs have not proved that the payments to Mr. Blais were so excessive that,
at some point, they were necessarily fraudulent as to DRB's creditors.

> **xvi. Additional Badge — # 16: Mr. Blais did not give credible testimony.**

In Husky on remand, the bankruptcy court treated the corporate insider's credibility as an
additional badge of fraud. *See* In re Ritz, 567 B.R. at 752. The plaintiffs urge this Court to do

---

[13] Mr. Blais' use of corporate funds for personal expenses may also have violated the terms of the
loans extended to DRB by On Deck Capital and Funding Metrics. But, again, it is not clear that the
plaintiffs should be able to assert injuries suffered by other creditors to make their case under section
523(a)(2)(A). That statute is debt—and therefore creditor—specific.

the same.  But, again, this case is not quite like Husky.  There, the insider represented that more than 100 intercompany transfers were loan payments but could not point to any supporting documentation.  Id.  The insider, "as an experienced businessman," must have known that such transfers would have required documentation, and the court deemed his lack of credibility a "suspicious fact."  Id. (quotation marks omitted).  Here, Mr. Blais was an experienced electrician, and conducted business through a corporate form for many years, but financial management was not his strength and he relied extensively upon his bookkeeper.  That said, the plaintiffs are right to an extent.  Mr. Blais testified credibly about some things, but not about others.  At times, his testimony was problematic because of its content; it was far-fetched, fantastic, contradictory, and unbelievable.  His testimony about the loan from Mr. Raymond shines as one such example.  At other times, his testimony was troubling because of its delivery.  When questioned on certain subjects, he was either forgetful or combative—like many witnesses accused of wrongdoing.  But Mr. Blais was not a monolithic witness.  Some of his testimony was more credible than the evidence pointed to by the plaintiffs on a disputed question of fact.  Ultimately, although an insider's credibility as a witness may shine some light on a corporation's fraudulent intent, the Court is not prepared to say that Mr. Blais' testimony is a strong signifier of such intent in this proceeding.

> **xvii.  Additional Badge — # 17: Mr. Blais paid in full all the debts DRB owed him, his wife, and other family members, leaving DRB's other creditors "holding the bag."**

The plaintiffs claim that DRB repaid loans from Mr. and Mrs. Blais and from other family members ahead of other creditors, and that this warrants an inference that DRB intended to defraud its creditors when it made payments to Mr. Blais.  This inference is not warranted.  Fraudulent transfer law is designed "to preserve the debtor's estate for the benefit of unsecured

creditors[.]"  In re Palladino, 942 F.3d at 59.  If the payments by DRB to Mr. and Mrs. Blais had been gifts, given solely to hide assets otherwise available to creditors, the transfers would have prioritized the insiders over bona fide creditors.  But Mr. and Mrs. Blais were themselves creditors of the corporation; they were owed for loans extended to DRB and Mr. Blais was owed compensation for his services.  DRB's repayment of the debts owed to Mr. and Mrs. Blais ahead of other creditors may have been redressable under 11 U.S.C. § 547 or the insider preference provision of the New Hampshire UFTA, N.H. R.S.A. § 545-A:5(II)—statutes the plaintiffs have not invoked.  But those payments do not tend to establish that DRB intended to defraud creditors by making payments to Mr. Blais between 2011 and 2017.

> xviii.  **Additional Badge —# 18: Mr. Blais knowingly gave CED a check that was covered by insufficient funds.**

Finally, the plaintiffs contend that the bad check given to CED in August 2017 tends to show that DRB intended to defraud them in making transfers to Mr. Blais.  It does not.  To the contrary, the check in question looks like an attempt to pay CED, an attempt that ultimately failed.  Mr. Blais warned CED that there were not sufficient funds in DRB's account and that it should hold the check until Friday.  The Court credits Mr. Blais' testimony that he expected more checks to come into DRB's account such that he had a reasonable expectation that the check would be honored by the drawee when presented.

> c.  **An Inference of Fraudulent Intent is not Warranted, Considering the Totality of the Circumstances.**

Some of the circumstances surrounding DRB's transfers to Mr. Blais might be viewed as indicative of fraudulent intent.  The transfers to Mr. Blais were transfers to an insider.  The transfers were made while DRB's liabilities exceeded the value of the assets reflected on its balance sheets.  Some of the transfers were made after DRB incurred substantial debts in 2017;

some were made after DRB's bank account was attached by a creditor in June 2017.  And DRB's practice of generating inaccurate accounts receivable reports is troubling.  Although these circumstances are somewhat suspicious, none weigh particularly heavily in the calculus.  On the other side of the ledger are the many badges raised by the plaintiffs that are not indicative of fraudulent intent and the evidence tending to negate fraudulent intent—including Mr. Blais' practice of lending his personal funds to DRB, the fact that he did not take a paycheck in some weeks based on DRB's finances, and his efforts to pay creditors up to the end.  When all of the facts and circumstances are considered together, the Court concludes that an inference of fraudulent intent is not warranted.  Although the transfers in question may have had the effect of hindering or delaying the plaintiffs in the collection of their debts, they were not animated by fraudulent intent, and they did not unacceptably contravene norms of creditors' rights.

Given the plaintiffs' failure to prove actual fraud, it is not necessary to dwell on the theories they invoke in their effort to establish a nondischargeable debt owed by Mr. Blais. Using state law fraudulent transfer concepts to divine actual fraud is already complicated by the differences between UFTA and section 523(a)(2)(A).  On one hand, the intent targeted by UFTA does not appear to be creditor specific.  *See* Unif. Voidable Transactions Act § 4 cmt. 2 (explaining that statutes targeting transfers voidable as to present or future creditors have long "been employed to invalidate nonpossessory property interests that are thought to be potentially deceptive, without regard to whether the deception is directed at an existing or identified creditor").  On the other hand, section 523(a)(2)(A) is debt and, therefore, creditor specific.  The overlap is imperfect.  With every additional legal theory added to the pile, that complexity increases.  Here, there is no need to wade into the thicket, in the absence of proof that DRB intended to defraud the plaintiffs when it compensated Mr. Blais for his services and repaid his

loans to the company.  The plaintiffs are not entitled to a determination of nondischargeability on Count I.

**COUNT II**

Count II seeks a determination that the debt that Mr. Blais owes to CED is excepted from discharge under 11 U.S.C. § 523(a)(4), at least to the extent of the funds paid to DRB under the Flatley contracts (in the approximate amount of $39,000).  Section 523(a)(4) renders nondischargeable, in an individual chapter 7 case, "any debt . . . for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny[.]"  Id.  CED does not argue that Mr. Blais committed embezzlement, larceny, or fiduciary fraud; its focus is on defalcation in a fiduciary capacity.  CED claims that Mr. Blais committed malfeasance as a fiduciary by using the funds received for work on the Flatley projects for purposes other than satisfying DRB's obligations to CED arising out of those projects.

In this context, defalcation "includes a culpable state of mind requirement akin to that which accompanies" embezzlement, larceny, or fiduciary fraud.  Bullock v. BankChampaign, N.A., 569 U.S. 267, 269 (2013).  That state of mind is one "involving knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior."  Id.  "[W]here the conduct at issue does not involve bad faith, moral turpitude, or other immoral conduct, the term requires an intentional wrong."  Id. at 273.  An intentional wrong includes "not only conduct that the fiduciary knows is improper" but also a situation in which "the fiduciary consciously disregards (or is willfully blind to) a substantial and unjustifiable risk that his conduct will turn out to violate a fiduciary duty."  Id. at 274 (quotation marks omitted).  "That risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves *a gross deviation* from the

standard of conduct that a law-abiding person would observe in the actor's situation." Id. (quotation marks omitted).

The next piece of the statutory puzzle is the meaning of "fiduciary capacity."  The predecessor to section 523(a)(4) (which featured language very similar to that now found in section 523(a)(4)) referred to "technical trusts, and not to those which the law implies from . . . contract." Davis v. Aetna Acceptance Co., 293 U.S. 328, 331, 333 (1934).  In reaching this holding, the Supreme Court explained: "It is not enough that, by the very act of wrongdoing out of which the contested debt arose, the [debtor] has become chargeable as a trustee ex maleficio. He must have been a trustee before the wrong and without reference thereto." Id.  Similarly, "fiduciary capacity under section 523(a)(4) exists only in circumstances constituting a technical or express trust." Andrade v. Hill (In re Hill), 610 B.R. 154, 162 (Bankr. D. Me. 2019) (quotation marks omitted).  "The features of an express trust include an explicit declaration of trust, a clearly defined trust *res*, and an identified trustee and beneficiary." Id.  "A technical trust, by contrast, arises under common law or statute." Id.

CED has not met its burden of proving that Mr. Blais owes it a debt arising out of a defalcation in a fiduciary capacity.  *See* Rutanen v. Baylis (In re Baylis), 313 F.3d 9, 17 (1st Cir. 2002) (assigning the creditor the burden of proving defalcation); Grogan v. Garner, 498 U.S. 279, 291 (1991) (holding that "the standard of proof for the dischargeability exceptions in 11 U.S.C. § 523(a) is the ordinary preponderance-of-the-evidence standard").  This failure of proof manifests itself in a couple of ways.

First, CED has not established that Mr. Blais was acting in the requisite fiduciary capacity.  The contracts between DRB and Flatley did not create an express trust that would give

rise to that capacity.[14]  "Not every written expression of trust is a declaration of trust.  For example, the insertion of words of trust into an ordinary commercial contract will not make it a declaration of trust."  Anderson v. Ingeneri (In re Ingeneri), 321 B.R. 601, 605 (Bankr. D. Me. 2005).  Stated differently, "[a] mere contractual relationship is less than what is required to establish the existence of a fiduciary relationship."  IBEW Local 231 v. Pottebaum (In re Pottebaum), No. 11-00634, 2013 WL 5592368, at *3 (Bankr. N.D. Iowa Oct. 9, 2013) (quotation marks omitted).  Section 523(a)(4):

> is aimed only at the express trust situation in which the debtor either expressly signified his intention at the outset of the transaction, or was clearly put on notice by some document in existence at the outset, that he was undertaking the special responsibilities of a trustee to account for his actions over and above the normal obligations that contracting parties have to each other in a commercial transaction.

Flanagan v. Flanagan (In re Flanagan), No. 00-10021-JMD, 2000 WL 33679397, at *3 (Bankr. D.N.H. Dec. 1, 2000) (quotation marks omitted).

"In New Hampshire, while no technical language or formalities are required to create an express trust, the requisite intent must still be present."  DeWitt v. Stewart (In re Stewart), No. 15-10250-JMD, 2016 WL 4402217, at *5 (Bankr. D.N.H. Aug. 18, 2016) (quotation marks omitted).  In Stewart, the Court rejected the plaintiffs' claim that a contractor became a fiduciary as to them based on their "trust" that he would use their advance payments to him for their project and based on their contract which obligated the contractor to "pay all valid bills and charges for material and labor" arising out of the plaintiffs' project.  See id. at **3, 6.  In analyzing the contract, the Court noted that there was no provision requiring the contractor to segregate the plaintiffs' advance payments "or even to use the payments for a specific purpose"

---

[14]  CED makes a fleeting attempt to establish a technical trust.  In the post-trial brief, CED asserts, without any elaboration, that "New Hampshire's mechanics lien law, NHRSA §447.1, et. seq. impliedly created . . . a trust[.]"  This argument is not sufficiently developed to warrant discussion.

and nothing indicating that the plaintiffs "retained an ownership interest in the payments" after they were made to the contractor.  Id. at *6.  The Court deemed this evidence insufficient to establish the creation of an express trust.  Id.

By comparison, in a decision from the Fourth Circuit Court of Appeals relied on by the plaintiffs, the court concluded that a contract created an express trust where it provided "that if Enterprise sold a piece of equipment to a third party before it remitted to Kubota the total payment due for that equipment, Enterprise *shall segregate the proceeds . . . and hold the same in trust for [Kubota]*" and further provided that Enterprise was entitled to use the proceeds *"free of trust only* when Kubota was repaid to its satisfaction."  Kubota Tractor Corp. v. Strack (In re Strack), 524 F.3d 493, 499-500 (4th Cir. 2008) (quotation marks omitted).  The court reasoned that, under the contract, "Enterprise was not entitled to treat the proceeds as its own and use them as it wished.  Rather, Enterprise was required to separate the proceeds, hold them for Kubota's benefit, and use them only once Kubota allowed."  Id. at 500.

The language of the contracts at issue here is more suggestive of a trust declaration than that used in Stewart, but less suggestive than that used in Kubota.  The Flatley contracts recite that funds paid to DRB for work on the Flatley projects were to be "received in trust and used to discharge [DRB's] financial obligations with respect to such work."  But there is no clear identification of a beneficiary or beneficiaries, as is required for an express trust.  There is no requirement that DRB segregate payments from Flatley, such that an identifiable trust *res* would be created.  And there was no extrinsic evidence of the parties' intentions with respect to the creation of a trust.  On balance, the Flatley contracts did not clearly signify an intention by Mr. Blais or otherwise put him on notice that he was assuming the responsibilities of a trustee beyond

44

the obligations that DRB was assuming in the ordinary course of its commercial dealings with Flatley.

Second, even if an express trust had been created, CED has not established a defalcation by Mr. Blais:  the evidence does not establish that Mr. Blais acted wrongfully or recklessly with respect to the Flatley funds.  Mr. Blais testified that he understood that he was supposed to use the Flatley funds to pay CED and others who supplied materials or labor on the Flatley projects. And he admitted that he did not use the funds to pay CED but instead used them to pay himself and other business expenses.  The Flatley payments were not held in trust for CED's exclusive benefit.  The contracts indicate that payments from Flatley were to be used to pay for debts arising out of DRB's work on the Flatley projects.  DRB may have incurred numerous debts arising out of its work on the Flatley projects, including obligations to compensate employees, and the record reveals that DRB used the Flatley funds (commingled with other funds) to make payroll.  The fact that CED was not paid out of the funds that DRB received from Flatley does not, by itself, establish the requisite culpability.

  In June 2017, DRB received a check for $34,528 from Flatley, and the check was promptly deposited into DRB's account at TD Bank.  Other than the opening deposit of $25, the Flatley deposit was the only deposit during June.  During the last ten days of June, the money in the TD Bank account was used for DRB's payroll, to make a payment to the State of New Hampshire, and to pay LDJ.  Beginning in July, other money was deposited into the TD Bank account and commingled with the remaining portion of the June payment from Flatley.  Many of

the withdrawals from the account from July 1 to July 19 were for payroll.[15]  It is possible that the employees who received these payroll checks worked on the Flatley projects; there was no evidence to support a finding on this point, either way.  That said, the use of a customer's payment to satisfy payroll obligations hardly seems like the type of wrongful or reckless behavior that would amount to a defalcation.

On July 20, DRB deposited a check in the amount of $1,695 from Flatley.  Again, CED did not establish that Mr. Blais—with wrongful intent or with a reckless disregard of his duties— put those funds to his own personal uses.  Instead, the money was deposited into an operating account, along with other funds, and then used to make several payments.  Although some of the withdrawals after July 20 appear to be for personal expenses, many appear to be for legitimate business expenses of DRB.   As to the personal expenses, there is simply no way to know whether they were paid with funds from Flatley or with funds from other customers.  CED makes no effort to trace any of the payments from Flatley using the lowest intermediate balance test or any other legal convention.

On August 4, DRB deposited a check for $3,010 from Flatley.  During August 2017, the total deposits into the account were nearly $100,000.  Again, there were many deposits into and withdrawals out of the account, and most of the withdrawals appear to be for legitimate expenses of DRB.  There were several checks payable to "cash" that cleared the account that month.  But, again, CED failed to adduce any evidence of what happened with the cash.  It is possible that it was used to pay DRB's "financial obligations" arising out of the Flatley contracts.  It is also

---

[15]  DRB also issued payments to LDJ, the State of New Hampshire, and an insurance company during this period, and wrote several checks payable to "cash."  There was no evidence that the checks issued to "cash" improperly made their way into Mr. Blais' pockets.  Indeed, there was no evidence whatsoever about where the cash went.

46

possible that the cash was used improperly by Mr. Blais.  Where the record is murky on a point, the party with the burden of proof is saddled with the consequences.

In sum, the evidence does not paint the picture of intentional or reckless behavior that CED sees.  Instead, it paints a picture of a small business owner attempting to manage his business through some cash flow difficulties.  It is true that some of his decisions exacerbated those difficulties and that the business ultimately ceased operations, but that is a far cry from a fiduciary who intentionally or recklessly injured a beneficiary of an express trust.  The Court is simply not persuaded that DRB took funds from Flatley and that Mr. Blais then dissipated those funds either with specific wrongful intent as to CED or in a manner that grossly deviated from the conduct that might be expected under the circumstances.[16]  Mr. Blais owes a debt to CED.  But that debt arises out of a personal guaranty, not out of a defalcation while acting in a fiduciary capacity.

## **CONCLUSION**

While his business was struggling, Mr. Blais may not have always made the most prudent decisions.  He may have been able to prolong DRB's life as an operating business by making different decisions, and he certainly engaged in some questionable business practices.  But, in the final analysis, that does not mean that DRB engaged in actual fraud or defalcation in a fiduciary capacity sufficient to justify denying Mr. Blais a discharge of debts owed to the plaintiffs.

Date:   September 30, 2021    /s/ Michael A. Fagone
                   Michael A. Fagone
                   United States Bankruptcy Judge
                   District of New Hampshire (by designation)

---

[16]  Even if CED had met its burden of proving defalcation in a fiduciary capacity, it would not be entitled to a determination that Mr. Blais is liable for a nondischargeable debt in the amount of $39,233 (representing all funds paid to DRB under the Flatley projects).  CED did not identify the portion of its claim that arose out of the sale of goods for the Flatley projects, but the record suggests that from May to July 2017, CED sold DRB goods for the Flatley projects valued at only $7,964.